**Richard J. DAVIS, Plaintiff,**

v.

**CITY OF ALBIA and Randy Hutchinson, Defendants.**

**No. 4:04–CV–00601–RAW.**

United States District Court,
S.D. Iowa,
Central Division.

March 29, 2006.

---

Robert Eugene Breckenridge, II, Breckenridge & Duker PC, Ottumwa, IA, for Plaintiff.

Hugh J. Cain, Hopkins & Huebner, Des Moines, IA, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WALTERS, United States Magistrate Judge.

This matter is before the Court on defendants' motion for summary judgment [15]. Plaintiff Richard J. Davis filed a petition in the Iowa District Court in and for Monroe County on October 22, 2004 in which he claimed that on October 24, 2002 Albia, Iowa police officer Randy Hutchinson arrested him without probable cause and used excessive force against him during the arrest. The state court petition thus alleged violations of Mr. Davis' rights under the Fourth Amendment to the United States Constitution. The petition was captioned as being brought under 42 U.S.C. § 1983. The basis of the City's alleged liability was not expressly stated in the petition, but municipal liability under § 1983 would lie only if the City's municipal policies or customs were responsible for the constitutional violations alleged.

On November 2, 2004 defendants removed the case to this Court on the basis of federal question jurisdiction. 28 U.S.C. §§ 1331, 1343(a)(3) and 1441(b). The case was referred to the undersigned for all further proceedings on January 4, 2005 pursuant to 28 U.S.C. § 636(c). The present motion is fully submitted following oral argument.

## I.

### SUMMARY JUDGMENT

A defendant is entitled to summary judgment if the affidavits, pleadings, and discovery materials show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Allsup, Inc. v. Advantage 2000 Consultants, Inc.*, 428 F.3d 1135, 1138 (8th Cir.2005); *Lund v. Hennepin County*, 427 F.3d 1123, 1125 (8th Cir. 2005); *Grabovac v. Allstate Ins. Co.*, 426 F.3d 951, 955 (8th Cir.2005); *Erenberg v. Methodist Hospital*, 357 F.3d 787, 791 (8th Cir.2004); Fed.R.Civ.P. 56(c); *see Baucom v. Holiday Companies*, 428 F.3d 764, 766 (8th Cir.2005). The Court must view the facts in the light most favorable to the non-moving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.*, 266 F.3d 884, 885–86 (8th Cir.2001) (citing *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir.2001)); see *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Howard v. Columbia Public Schl. Dist.*, 363 F.3d 797, 800 (8th Cir.2004)("unreasonable inferences or sheer speculation" not accepted as fact); *Erenberg*, 357 F.3d at 791. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Hartnagel*, 953 F.2d at 395 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Hitt v. Harsco Corp.*, 356 F.3d 920, 923 (8th Cir.2004); *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); cf. *Johnson v. University of Iowa, St. Bd. of Regents*, 431 F.3d 325, 328 (8th Cir.2005)("Summary judgment is still appropriate ... when the disputed facts will not affect the outcome of the suit"); *Baucom*, 428 F.3d at 766 ("There is no genuine issue of material fact if the evidence is such that a reasonable jury could not return a verdict for [plaintiff]").

The moving party must first inform the court of the basis for the motion and identify the portions of the summary judgment record which movant contends demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse*, 193 F.3d at 939; *see Grabovac*, 426 F.3d at 955 (non-moving party cannot "simply rest upon the pleadings," quoting *Jeseritz v. Potter*, 282 F.3d 542, 545 (8th Cir.2002)); *Baucom*, 428 F.3d at 766 (plaintiff may not rely on "mere allegations"); *Hitt*, 356 F.3d at 923. "We consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." *Howard*, 363 F.3d at 801. In assessing a motion for summary judgment, a court must determine whether a fair-minded trier of fact could reasonably find for the non-moving party based on the evidence presented. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir.2000).

## II.

### FACTUAL BACKGROUND

Richard Davis, age 65 at the time, has a "persons with disabilities parking permit"

which he displays by means of a removable windshield placard. See Iowa Code § 321L. 1(5)(c). He received the permit following an automobile accident in 1987. (Def.App. at 2–3). Davis lives in Monroe County, Iowa, just outside the county seat, Albia. On the afternoon of October 24, 2002, Davis drove his pickup truck to Albia to the intersection of Benton and Main and parked in a person's with disabilities parking space. (*Id.* at 8–9). He got out and went into the Albia Café across the street for a piece of pie and a drink. (*Id.* at 6, 10).

Davis' truck had a rearview mirror but he left his parking placard on the dashboard. Though there were various papers on the dashboard, the jury could conclude the placard would have been readily identifiable by a person standing outside the vehicle looking in. (*Id.* at 4–6, 24–25; Pl. App. Starns Depo. at 14–15). Davis' understanding of the regulations for display of the placard was it "[j]ust had to be visible from the outside of the vehicle." (Def.App. at 5).

Defendant Randy Hutchinson, a detective sergeant on the Albia police force, was dispatched at 3:58 p.m. in response to a complaint that a truck was illegally parked in a "handicapped" parking space. (Def.App. at 26, 28, 31). If the Court understands the Monroe County Sheriff's dispatch log accurately, Hutchinson arrived at 4:07 p.m.[1] He pulled up behind Davis' truck and waited. It was raining. Hutchinson did not get out of his patrol car to examine the truck. (Pl.App. Hutchinson Depo. at 12–13). From his vantage point there was no indication the truck had a disabilities parking permit. Hutchinson ran the license plate and learned Davis was the owner of the truck. Hutchinson had seen Davis a couple of times before, but was not familiar with him. (*Id.*)

At the time the usual practice of the Albia police department concerning issuance of citations for disabilities parking violations was to wait for a short period of time and then if the driver did not appear, file the citation and affidavit with the court. (*Id.* at 10; Pl. Stmt. of Facts ¶ 6 and Def. Response). If he was able to make contact with the driver, Hutchinson's practice was to issue the citation to the driver and have it signed by the driver. (Pl.App. Hutchinson Depo. at 20).

While he was in the café, Davis was approached by a friend who told him a police officer was outside giving him a ticket for parking in a handicapped space. (Def.App. at 11–12). Davis told the friend he was not concerned because his parking sticker was on the dash of the truck. He testified he finished his food in 15 to 20 minutes and left the café.[2] (*Id.* at 12).

Hutchinson had asked the dispatcher for Davis' personal information in order to complete the citation he had been writing when he observed Davis crossing the street and approaching the truck. (Pl.App. Hutchinson Depo. at 13–14; Def.App. at 26). Hutchinson, who was in uniform, got out of his patrol car and approached Davis. What Davis and Hutchinson said to each other is disputed, though their physical interaction was captured and recorded on the video camera in Hutchinson's patrol car.

In his deposition Hutchinson says he greeted plaintiff and asked for his driver's

---

1. Hutchinson gave the 10–23 radio sign at 4:07 p.m. to signal his arrival at the scene. (Def. Supp.App. at 5).

2. This time estimate is probably verifiably wrong because the dispatch log indicates the parking complaint was received at 3:58 p.m., Hutchinson arrived at 4:07 p.m., and the incident occurred at about 4:13 p.m. (Def.App. at 26).

license and registration, Davis opened the door of his truck, pointed to the location of the placard on the dash and told Hutchinson, he had a "f——ing permit" right there. (Def. Supp.App. at 4). Hutchinson looked and saw the corner of the placard with its distinctive blue color, but testified the numbers were not visible. Hutchinson did not consider the placard to be adequately visible. (*Id.* at 7). Hutchinson began to explain to Davis that the permit "had to be visible from the outside," at which point Davis interrupted and told Hutchinson to "go f—— yourself." (*Id.* at 5). Hutchinson was taken aback. He started to say something about official business when Davis interrupted again. Hutchinson asked "what did you just say" and Davis repeated "I told you to go f—— yourself" and attempted to get in the truck. (Def. Supp. App. at 6). Hutchinson took hold of Davis' arm and told him not to get in the truck. (Def. Supp.App. at 7). Davis pulled away and continued to enter his truck, at which time Hutchinson says he told Davis he was under arrest. (*Id.*). Hutchinson intended to arrest Davis for interference with official acts. (*Id.* at 8). *See* Iowa Code § 719.1(1).

Davis testified in his deposition that he saw Hutchinson as he approached his truck. He pointed to the dashboard and told Hutchinson the handicapped parking permit was on the dash. (Def.App. at 13). According to Davis, Hutchinson then informed him he was under arrest. (*Id.*). In response Davis says he told Hutchinson "to go get f——d," and that he did not have an arrestable charge. (*Id.* at 15). Davis agrees Hutchinson asked him to repeat what he said and he obliged. (*Id.*). According to Davis, Hutchinson told him not to get in the truck, Davis said it was raining and he was getting in the truck and did so. (*Id.* at 14; Pl. Stmt. Facts ¶ 15 and Def. Response).

A brief struggle ensued when Davis attempted to get in his truck. Hutchinson testified:

> He got in the truck. He's got keys in his right hand going for the ignition. I jumped in on top of him laying across his body, holding him still, trying to hold his arm from putting the key in. I reached up to my lapel mike and I called 10–78 [3] a couple times.
>
> All the while this has happened really quick. I'm ordering—telling him he's under arrest, get out of the truck. After I called 10–78, I broke away. I had—well, I had reached—Let me back up.
>
> Called 10–78. My hand went down. I pulled a pepper spray out. Had it in my right hand. I backed up. The whole time I'm telling him he's under arrest, get out of the vehicle. He sees the pepper spray. He says, "If you spray me with that shit, it will be the last f——ing thing you do."

(Pl.App. Hutchinson Depo. at 24–25). Hutchinson testified that after Davis made the last statement he decided to spray him. (*Id.* at 27).

Monroe County reserve deputy Thomas Starns responded to Hutchinson's call for assistance. Hutchinson told Starns what had happened. According to Starns, "[Hutchinson] said I reached in and I sprayed him across the eyes and then I stepped back and he said I took a breath and I sprayed him again .... us[ing] about three-quarters of a can." (Pl.App. Starns Depo. at 11).

Hutchinson declined to characterize the struggle with Davis in the truck as a fight. Rather, Hutchinson believed Davis was struggling to get the key in the ignition. He admits Davis was not attacking him. (Pl.App. Hutchinson Depo. at 25). Hutch-

3. "10–78" is police code for "officer needs assistance."

inson described Davis as nonviolent until he was sprayed. (*Id.* at 32). Davis did not put the key in the ignition and the jury could conclude he made no effort to leave the scene.

Davis testified that after he got in the truck and fastened his seatbelt, Hutchinson came in the truck, put his arm around his neck, pulled out his pepper spray, pointed it at his face, and threatened to spray him. (Def.App. at 16–17). Davis admits Hutchinson told him to get out of the truck. (*Id.* at 19). While he denies the profanity, he also admits that when confronted with the pepper spray he told Hutchinson that if he sprayed him it would be the last thing he ever did. (*Id.* at 16–17). Hutchinson then sprayed him. If the Court understands Davis' deposition testimony correctly, Hutchinson sprayed him first from about a foot away and then backed out a few feet and sprayed him again. (*Id.* at 17–18).

The events shown in the video recording from Hutchinson's patrol car are not completely consistent with either version given by the parties. The audio did not record what Davis and Hutchinson said to each other.[4] From the time Hutchinson first approached Davis to the last discharge of pepper spray took only about forty-five seconds. The video shows Hutchinson meeting Davis at the driver's side door of the truck. Davis opens the door and points to the placard. They talk for about fifteen seconds. Hutchinson then gets in the truck as Davis attempts to prevent him from doing so. Hutchinson briefly puts his right arm around Davis' neck or shoulder in an apparent effort to prevent him from entering the truck. He almost immediately withdraws his right arm and with

his right hand keys his lapel mike to give the 10–78 signal (which is heard on the audio) while appearing to keep hold of Davis with his left hand. Hutchinson does not enter the truck except for a second or two as he leans in while grabbing Davis around the neck or shoulder as indicated above. For a second or two after making the 10–78 call Hutchinson appears to take hold of Davis' torso with both hands. Hutchinson then releases his right hand and, while still holding Davis with the left, takes his pepper spray in his right hand and points it at Davis from a distance of one or two feet. Words appear to be exchanged. Hutchinson releases his hold on Davis and backs up a short distance, perhaps a foot, still pointing the pepper spray at Davis holding the spray canister out at arm's length. Davis is sitting behind wheel and appears stationary. After a few more seconds Hutchinson appears to spray Davis two or three times at close range, with the spray canister about even with the door opening. Hutchinson backs up two or three feet and sprays Davis with several more short bursts. Davis thrashes briefly in the truck as he is sprayed, and puts his hands up in an attempt to block the spray. He then slumps over as Hutchinson employs his asp baton.

Davis stayed in his truck, disabled by the pepper spray. The police chief and other officers arrived within two minutes of the first 10–78 call. They took over and Hutchinson stepped away. Davis was assisted from the truck, and collapsed in the street. He was taken by ambulance to the hospital. (Def.App. at 21–23).

Davis was charged in a two-count Trial Information with interference with official

---

4. In his deposition Davis said he thought the videotape had been altered because it does not show him putting on his seatbelt or Hutchinson's spraying him with the first shot of pepper spray at close range. (Def.App. at

17). There is no evidence that the videotape has been altered and to the Court the video does appear to show Hutchinson leaning in the truck and spraying Davis with two or three bursts at close range.

acts and assault on a peace officer. (Def.App. at 34).[5] He was also given a citation for improper use of a disabilities parking space. (*Id.* at 36). All of these alleged offenses were dismissed under a deferred prosecution agreement. (*Id.* at 37).

In six and a half years working for the Albia Police Department, Hutchinson had used pepper spray on one other citizen for a traffic offense. (Pl.App. Hutchinson Depo. at 29).

The parties appear to agree that on the date of the incident, Albia's policy on use of non-deadly force was as follows:

NON DEADLY FORCE WEAPONS AND METHODS:

1. A police officer is not permitted to use a NON DEADLY weapon unless qualified in its proficient use as determined by training procedures.

2. NON DEADLY weapons authorized for use:

\* \* \* \* \* \*

2. DEF–TEC MK–IV Pepper Mace. (Def. Supp.App. at 17). Hutchinson had been recertified as a chemical munitions instructor on October 16, 2002, approximately a week before the incident. (*Id.* at 18).

## III.

## DISCUSSION

### A. *Hutchinson*

■■■ Hutchinson's motion for summary judgment is predicated on the defense of qualified immunity. Qualified immunity protects a government official performing a discretionary function from suit unless the official's conduct violates a clearly established constitutional right of which a reasonable person would have

known. *Pagels v. Morrison*, 335 F.3d 736, 739–40 (8th Cir.2003)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "When the defense of qualified immunity is raised 'on a motion for summary judgment', the first question must be whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional right." *Szabla v. City of Brooklyn Park, Minn.*, 429 F.3d 1168, 1173 (8th Cir.2005)(citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)), *reh'g en banc granted in part, op. vacated in part on other grounds*, 437 F.3d 1289 (8th Cir.2006); *see Henderson v. Munn*, 439 F.3d 497, 501–02 (8th Cir.2006); *Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir.2005). If that answer is "yes," then the court considers "whether the right was clearly established in the specific context of the case." *Szabla*, 429 F.3d at 1173. "This second step is a 'fact-intensive inquiry and "must be undertaken in light of the specific context of the case, not as a broad general proposition." ' " *Janis*, 428 F.3d at 799 (quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004), quoting in turn *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). "[T]he question whether the ... right was clearly established at the time the defendant acted ... requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." *Littrell*, 388 F.3d at 583 (internal quotations and citations omitted). Objective reasonableness is determined "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865; *see McClendon v. Story Co. Sheriff's Office*, 403 F.3d 510, 515–16 (8th Cir.2005).

---

**5.** The assault charge apparently stemmed from Hutchinson's belief that as Davis thrashed around in the truck after being sprayed Davis was attempting to hit him. (Pl. App. Hutchinson Depo. at 32–34).

■ Qualified immunity is a question of law for the court to decide, though the jury may have to determine disputed predicate facts. *Littrell*, 388 F.3d at 584–85.

### 1. *Probable Cause to Arrest*

■ The Fourth Amendment to the United States Constitution prohibits unreasonable seizures. An arrest is a seizure. A police officer may make a warrantless arrest without violating the Fourth Amendment if the officer has probable cause to believe an offense has been committed in his or her presence, even if the offense is a "very minor" one. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). An arrest is lawful if there is probable cause to believe the person arrested "[ h] as violated any applicable statute, even one not contemplated by the officer[ ] at the moment of arrest." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1106 (8th Cir.2004).

> An officer has probable cause to arrest a suspect without a warrant if the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

*Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir.1993)(quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). *See Kukla v. Hulm*, 310 F.3d 1046, 1049 (8th Cir.2002).

It is difficult to know which of the parties' versions of the arrest is more favorable to Mr. Davis. He relies on Hutchinson's version; defendants rely on Davis'. So, the Court will examine both.

■ If, as Davis tells it, he was arrested immediately after Hutchinson made contact with him the arrest would be lawful only if Davis could have been arrested for improper display of his persons with disabilities placard. It undoubtedly would come as a surprise to most Iowans with a disability to learn that they can lawfully be arrested for failing to display a persons with disabilities placard by hanging it from the rearview mirror when parked in a disabilities parking space even if they have a valid placard in their possession which can be seen from outside the vehicle, but that appears to be the law in Iowa. Indeed, at the time of the incident Hutchinson was unsure if a disabilities placard had to hang from the rearview mirror, though that was his interpretation of the law at the time. (Pl.App. Hutchinson Depo. at 11–12, 16).[6]

Qualifying persons with disabilities have the option of obtaining a special registration plate for their vehicle, a sticker to apply to their registration plate, or, as Davis had, a removable windshield placard. Iowa Code § 321L.2(1)(a). The placard is only to be displayed when the vehicle is parked in a "persons with disabilities parking space." *Id.* at § 321L.2(4). The Iowa Department of Transportation (DOT) is tasked with adopting rules "[g]overning the manner in which persons with disabilities parking permits are to be displayed in or on motor vehicles." *Id.* at § 321L. 8(1)(b). The rules adopted by the DOT in this regard provide:

> Display. A removable windshield placard shall be displayed by hanging it from the rearview mirror in the driver's compartment of the motor vehicle so that it can be read through the windshield from outside the vehicle. If there is no rearview mirror in the vehicle, the placard shall be displayed on the dash-

---

**6.** Hutchinson was going to proceed with issuing the citation because he did not think the permit was adequately visible from outside the truck. (Pl.App. Hutchinson Depo. at 19).

board. If the vehicle has no rearview mirror and no dashboard, the person with a disability may obtain a persons with disabilities special registration plate parking sticker to be affixed to the vehicle's registration plate.

Iowa Admin. Code § 761–411.3(2). "The use of a persons with disabilities parking space by an operator of a vehicle not displaying a persons with disabilities parking permit ... or by a vehicle in violation of the rules adopted by the [DOT] under section 321L.8, constitutes improper use of a persons with disabilities parking permit, which is a misdemeanor for which a scheduled fine shall be imposed upon the owner, operator, or lessee of the vehicle or the person to whom the ... permit is issued." Iowa Code § 321L.4(2); *see id.* at § 805.8A(1)(c). A peace officer has authority to enforce the provisions of § 321L.4. *Id.* at § 321L.4 (3).

 An arrest without a warrant may be made by a peace officer for a public offense committed in the officer's presence. Iowa Code § 804.7. "A public offense is that which is prohibited by statute and is punishable by a fine or imprisonment." *Id.* at § 701.2. A peace officer may issue a citation in lieu of a warrantless arrest, which is common practice where a scheduled fine is the penalty, but is not required to. *Id.* at § 805.1(1). *See State v. Orozco*, 573 N.W.2d 22, 25 (Iowa 1997)(peace officer has authority to make an arrest for a scheduled traffic violation). Whether to make an arrest instead of issuing a citation is within the peace officer's discretion. *See State v. Adams*, 554 N.W.2d 686, 690 (Iowa 1996).

Davis' truck was parked in a persons with disabilities parking space. The truck had a rearview mirror in the "driver's compartment." Davis did not hang the placard from the mirror as required by the DOT rule, but put it on the dashboard. There was thus probable cause to believe Davis had committed the misdemeanor public offense of improper use of a persons with disabilities parking permit. The offense occurred in Hutchinson's presence and he could therefore make a warrantless arrest of Davis without violating either Iowa law or the Fourth Amendment. Davis thought he was in compliance with the law by placing the placard on the dashboard, and Hutchinson was evidently unsure about the rearview mirror requirement, but these facts do not affect whether there was probable cause for an arrest.

 If Hutchinson's version of the incident is believed, he arrested Davis for interference with official acts. Iowa Code § 719.1(1). The statute makes it unlawful for a person to "knowingly resist[ ] or obstruct[ ] anyone known by the person to be a peace officer ... in the performance of any act which is within the scope of the lawful duty or authority of that officer...." *Id.* Its purpose "is to enable officers to execute their peace-keeping duties calmly, efficiently, and without hindrance." *State v. Buchanan*, 549 N.W.2d 291, 294 (Iowa 1996). The crime is a general intent crime, the elements of which are (1) knowledge of the officer's status as a peace officer; (2) knowledge that the officer was acting within the scope of his lawful duty or authority; and (3) knowing resistance or obstruction of the officer in the performance of the act. *See id.* at 293. While the Iowa Criminal Jury Instructions do not have the force of law, they are useful to the extent they reflect a consensus understanding of the meaning of legal terms. They instruct that " '[r]esist' means to oppose intentionally, interfere with or withstand" and " '[o]bstruct' means to hinder intentionally, retard or delay." Iowa Crim. Jury Inst.1910.2. "Obstruct" is broader than "resist" and "includes putting obstacles in the path of officers completing their duties." *Lawyer*, 361 F.3d at 1107

(construing Iowa law and quoting *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa App. 1984)). The terms "resist" and "obstruct" imply active interference. *State v. Smithson*, 594 N.W.2d 1, 2 (Iowa 1999). They therefore do not "include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically." Iowa Code § 719.1(3).

▓▓▓▓ The use of actual or constructive force in resisting an officer violates § 719.1. *See State v. Donner*, 243 N.W.2d 850, 854 (Iowa 1976); *State v. Turk*, 595 N.W.2d 819, 822 (Iowa App.1999), *overruled on other grounds by State v. Maring*, 619 N.W.2d 393, 395 n. 1 (Iowa 2000) (per curiam opinion). The use of force, however, is not an essential element. *Lawyer*, 361 F.3d at 1107. "The key question is whether the officer's actions were hindered." *Id*.

▓▓▓▓ Davis knew Hutchinson was a police officer. Davis also knew Hutchinson had made contact with him because Hutchinson did not think Davis' handicapped placard was properly displayed. Hutchinson had been in the process of writing a citation when Davis returned to his truck. When Davis started to get into his truck Hutchinson took hold of his arm and told him not to do so. A law enforcement officer may, consistent with the Fourth Amendment, direct a driver to exit a vehicle during a lawful traffic stop. *Lawyer*, 361 F.3d at 1105 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)); see *United States v. Gregory*, 302 F.3d 805, 809 (8th Cir.2002), *cert. denied*, 538 U.S. 992, 123 S.Ct. 1815, 155 L.Ed.2d 691 (2003). It follows that an officer may lawfully require the driver of a vehicle already

stopped to remain outside the vehicle during the brief period of detention required to issue a citation. Thus, Hutchinson was acting within the scope of his authority when he told Davis not to get into the truck and took hold of his arm to restrain him.[7] When Davis jerked away from Hutchinson, entered the truck in violation of Hutchinson's instructions and did not come out when told to do so, he actively resisted and hindered Hutchinson in the issuance of the citation. *See State v. Legg*, 633 N.W.2d 763, 772 (Iowa 2001)(refusal to stop vehicle when signaled to do so, driving home, and retreating into garage interfered with officer's lawful performance of duty to issue ticket for traffic offense); *Turk*, 595 N.W.2d at 822 (sufficient evidence of interference where after officers "told defendant he was under arrest he struggled"). The knowledge required to establish the offense could be inferred from the circumstances. Hutchinson thus had probable cause to arrest Davis for interfering with official acts in violation of § 719.1(1).

▓▓▓▓ Even if the circumstances that confronted Hutchinson were to be later construed as lacking in probable cause to believe the offense of interference with official acts had been committed, as in *Lawyer*, "the lack of detailed judicial guidance on the interplay among the statutory terms 'obstruct,' 'resist' and 'verbal harassment,'" would make Davis' arrest not violative of clearly established law with the result Hutchinson would have qualified immunity from suit resulting from the arrest. 361 F.3d at 1108. A reasonable officer in Hutchinson's position could believe Davis' conduct constituted interference with official acts. Stated otherwise, Hutchinson

---

7. Davis testified in his deposition that Hutchinson did not try to block him from getting in his truck (Def.App. at 16), but the jury could not reasonably credit this testimony because it is evident from the video that Hutchinson did attempt to physically restrain Davis from entering the truck.

had at least "arguable probable cause" to arrest Davis for the offense. *Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir.1989)(quoting *Hannah v. City of Overland,* 795 F.2d 1385, 1389 (8th Cir.1986) and *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985)).

Davis' main argument is that Hutchinson did not have to have him personally sign the citation, but could have, as Hutchinson admitted, filed the citation with the court together with an affidavit as in cases where the driver is not present. Davis, however, was present and Hutchinson had the lawful authority to require Davis to remain outside the truck while he issued a citation. That an officer might have exercised his discretion to issue a citation in a different manner does not justify interference with the lawful means chosen by the officer to exercise his authority.

To summarize on the unlawful arrest claim, Davis does not get past the first part of the qualified immunity analysis. Under either his version of events or Hutchinson's the facts alleged, viewed favorably to Davis, do not demonstrate a violation of his Fourth Amendment right not to be subjected to a warrantless arrest without probable cause. Even assuming there was no probable cause to arrest Davis for the offense of interference with official acts, the probable cause to believe Davis committed the public offense of improper use of a persons with disabilities permit avoids the Fourth Amendment arrest claim. If the analysis of the probable cause to support an arrest for interference with official acts proceeded to the second stage of the qualified immunity analysis, the constitutional right was not clearly established in context. The end result is that Hutchinson has qualified immunity from suit on the claim of arrest without probable cause.

2. *Excessive Force*

Excessive force claims are also analyzed under the Fourth Amendment. *Janis,* 428 F.3d at 799 (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). It has long been recognized that the right to make an arrest "carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *see* Iowa Code § 804.8 (in making an arrest, a peace officer may use "any force which [he] reasonably believes to be necessary to effect the arrest. . . ."). The force used, however, must be "objectively reasonable under the particular circumstances." *Littrell,* 388 F.3d at 583 (quoting *Greiner v. City of Champlin,* 27 F.3d 1346, 1354 (8th Cir.1994)). Reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Wertish v. Krueger,* 433 F.3d 1062, 1066 (8th Cir.2006)(quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865. "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct." *Henderson,* 439 F.3d at 502 (quoting *Foster v. Metro. Airports Comm'n,* 914 F.2d 1076, 1081 (8th Cir. 1990)); *see Graham,* 490 U.S. at 396, 109 S.Ct. 1865. "In addition to the circumstances surrounding the use of force, we may also consider the result of the force." *Crumley v. City of St. Paul, Minn.,* 324 F.3d 1003, 1007 (8th Cir.2003).

At the first stage of the qualified immunity inquiry the Court concludes the facts, taken in the light most favorable to Davis, could support a finding by the jury that Hutchinson's use of pepper spray was excessive in that it was not reasonably necessary in order to arrest Davis or bring him under control. There is no genuine issue about the facts that Hutchinson told Davis not to enter the truck, told him he was under arrest,[8] Davis physically resisted Hutchinson's attempt to restrain him from entering the truck, a brief struggle occurred, Hutchinson told Davis to exit the truck, Davis did not do so or signify a willingness to get out, Hutchinson displayed his pepper spray canister, Davis told Hutchinson if he sprayed him that would be the last thing he did, and Hutchinson sprayed Davis causing the intended discomfort, but (as far as the record indicates) no significant injury.

At first glance none of these facts are particularly good for Davis, but the jury might take a closer look. Davis' conduct was very low on the severity scale under either of the two possible public offenses for which Davis could have been arrested; nonviolent, simple misdemeanors.[9] Despite the brief altercation, the jury could reasonably find that Davis had not been violent toward Hutchinson, had not attempted to put the truck key in the ignition or otherwise attempted to flee, and posed no immediate risk to do so. The jury could also find Hutchinson's safety was not at risk and Davis' statement that if Hutchinson sprayed him with the pepper spray that was the last thing he would do

was a threat Davis had no ability at the time to carry out. The jury might reasonably consider Hutchinson's immediate, almost reflexive use of pepper spray after Davis made the threat to have been an unwarranted response because the incident had escalated so rapidly Davis did not have sufficient time to comply with Hutchinson's directive to get out of the truck or, beyond the initial anger, consider the consequences of the use of force threatened when Hutchinson took the spray canister in hand. The evidence therefore could support a finding a more graduated response to the situation was called for before resort to the pepper spray was reasonable.

▮▮▮▮ If the evidence would support the finding of a constitutional violation, the question at the next, second stage of the qualified immunity inquiry is whether the constitutional right violated was clearly established in the factual context. *See Szabla*, 429 F.3d at 1173. At this stage the Court asks

—not whether plaintiff may be able to establish a constitutional violation—but, rather, whether [he] may be able to establish a violation of a constitutional right of which the contours were so defined at the time of the [spraying] that a reasonable officer in [Hutchinson's] position would have understood that what he was doing violated the law.

*Parks v. Pomeroy*, 387 F.3d 949, 957 (8th Cir.2004), *cert. denied*, 544 U.S. 1049, 125 S.Ct. 2300, 161 L.Ed.2d 1089 (2005)(citing *Anderson v. Creighton*, 483 U.S. 635, 640,

---

8. Under Davis' version Hutchinson told him he was under arrest before instructing him not to enter the truck.

9. The state court by Trial Information charged Davis with a violation of Iowa Code § 719.1(2), a serious misdemeanor. (Def.App. at 34). That code section is reserved for persons in the custody of the Iowa Department of Corrections and would not have applied to Davis. The charging language, however, tracked the simple misdemeanor language of Iowa Code § 719.1(1), the generally applicable interference with official acts offense. The Iowa legislature downgraded the offense to a simple misdemeanor in 1999. *Legg*, 633 N.W.2d at 766 n. 2.

107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). With excessive force claims, the second stage of the qualified immunity inquiry operates to "protect police officers from the sometimes 'hazy border between excessive and acceptable force,' ..., and to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S.Ct. 2151 (citation omitted). On the other hand, there is no immunity if " 'on an objective basis, it is obvious that no reasonably competent officer would have concluded' the defendant should have taken the disputed action." *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir.2001)(quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

In the Court's judgment an officer in Hutchinson's position could have reasonably believed the use of pepper spray on Davis was lawful in light of the applicable law at the time. The case law gave no notice that Hutchinson's conduct was constitutionally impermissible and provided some basis to believe it was permissible.

Pepper spray has most often been found to amount to excessive force when its use is gratuitous or clearly unnecessary as the two cases cited by Davis serve to illustrate. In *Martinez v. New Mexico Dep't of Public Safety*, 47 Fed.Appx. 513 (10th Cir. 2002), plaintiff was under arrest, in handcuffs, and standing beside the police cruiser when she was sprayed with "mace." *Id.* at 517. Plaintiff had merely refused to get into the police car because she wanted to first see the officer's identification. *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir.), *cert. denied*, 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002), involved the pepper spraying of peaceful protestors who had "linked themselves together with self-releasing lock-down devices known as 'black bears'." *Id.* at 1127. The protestors had a way to unlink themselves, but the authorities could unlink them by using a hand-held grinder to cut the cylinders which held the protestors together, something the defendants had safely done many times before. The defendants had changed tactics to use pepper spray in an effort to make the protestors release themselves. Qualified immunity was denied because the pepper spray was clearly unnecessary to subdue, remove, or arrest the protestors. In both cases, the plaintiffs were under the control of law enforcement officers and there were no "tense, uncertain or rapidly evolving circumstances" with which the officers had to contend. *Id.* at 1130–31.

One appellate court has summarized the status of the case law at about the time of the incident here:

"Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else. Courts have consistently concluded that using pepper spray is reasonable ..., where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital. Furthermore, 'as a means of imposing force, pepper spray is generally of limited intrusiveness,' and it is designed to disable a suspect without causing permanent physical injury." *Gainor v. Douglas County*, 59 F.Supp.2d 1259, 1287 (N.D.Ga.1998) (quoting *Griffin v. City of Clanton*, 932 F.Supp. 1359, 1369 (M.D.Ala.1996)). Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.

*Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir.2002).

Cases in our circuit are generally in accord with the loose dichotomy described

by the *Vinyard* court. *See Lawyer*, 361 F.3d at 1105 (reasonable to pepper spray motorist stopped for speeding who refused to get out of car to sign citation, ignored request to open door and officer reasonably felt he was in danger when he reached inside window to unlock door and window began rolling up); *Moore v. City of Lincoln*, 2005 WL 3455123, * 6 (D.Neb.2005)(reasonable to use pepper spray against struggling and kicking defendant); *Rahn v. Hawkins*, 73 Fed.Appx. 898, 901 (8th Cir.2003)(no qualified immunity for "macing an unconscious suspect"); *Mosely v. Black Hawk County, Iowa*, 2000 WL 34008734, *4 (N.D.Iowa 2001)(no qualified immunity where evidence plaintiff "was maliciously pepper-sprayed by one or more officers while handcuffed and restrained ....").

Even when viewed favorably to Mr. Davis the inescapable facts here are, to repeat, Hutchinson gave a lawful directive to Davis not to get in the truck, told Davis he was under arrest, Davis physically resisted Hutchinson's effort to prevent him from getting in the truck, a brief struggle resulted, Davis did not exit the truck when Hutchinson told him to do so or give any indication he would comply, Davis threatened Hutchinson when Hutchinson took out his pepper spray, and the circumstances were evolving rapidly. These facts do not clearly place the use of pepper spray into either the acceptable or unacceptable category under the established law at the time with the result that Hutchinson's conduct falls within the "hazy" border area where police officers may claim qualified immunity. A reasonably competent police officer in Hutchinson's position might have concluded that the use of pepper spray was a lawful means of effecting Davis' arrest and preventing further escalation of the confrontation. It follows Davis' constitutional right not to be subjected to excessive force was not clearly established in the specific context of this case.[10]

## B. *The City*

 The Court has found that while under a favorable view of the evidence Davis may be able to establish a violation of his Fourth Amendment constitutional right not to be subjected to excessive force, Hutchinson is entitled to qualified immunity because the contours of the right were not clearly established in the factual situation confronting Hutchinson.[11] "[A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." *Avalos v. City of Glenwood*, 382 F.3d 792, 802 (8th Cir.2004)(quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir.1999)); *see Monell v. Dep't of Soc. Services*, 436 U.S. 658, 690–

---

**10.** Davis contends Hutchinson told reserve deputy Starns that "he sprayed Mr. Davis because he didn't have a sticker hanging in his window." (Pl. Brief at 8 (citing Pl.App. Starns Depo. at 8)). Starns actually testified as follows:

> Q. Okay. What happened when you arrived?
> A. As soon as I got on to the scene, Officer Hutchinson seen me. He knelt down and closed his asp. You have to bang them to close them. I got out. I seen this gentleman, Mr. Davis, I believe, sitting sideways in his car with his hands over his face. I

yelled at Randy. I said "what's going on?" And you have to understand, his adrenaline was up. He had tunnel vision. He said— he said he didn't have his handicapped sticker hanging in the window. But this was because he was—your adrenaline is running, he's excited and everything. (*Id.* at 8–9).

**11.** Davis has not argued his alleged unlawful arrest was the result of a municipal policy or custom. Moreover, as Davis did not demonstrate a violation of his constitutional rights in this regard, the City could not be liable.

91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability occurs only if the policy or custom caused the constitutional violation. *Avalos,* 382 F.3d at 802 (citing *Angarita v. St. Louis Cty.,* 981 F.2d 1537, 1546 (8th Cir.1992)). However, liability may occur "even though the officer who carried out the deprivation is entitled to qualified immunity." *Szabla,* 429 F.3d at 1175 (citing *Kuha v. City of Minnetonka,* 365 F.3d 590, 603 (8th Cir.2003)).

■■■ Municipal "policy" and municipal "custom" are not the same thing. An official policy represents "a deliberate choice to follow a course of action ... made from among various alternatives." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); see *Kuha,* 365 F.3d at 604 (citing relevant Eighth Circuit case law). Establishing liability on the basis of a municipal custom on the other hand requires proof of "a continuing, widespread, persistent pattern of unconstitutional misconduct" by municipal employees, deliberate indifference to or tacit authorization of such conduct by the municipality's policymaking officials, and that the custom was "the moving force behind the constitutional violation." *Kuha,* 365 F.3d at 604 (quoting *Mettler,* 165 F.3d at 1204).

■■■ The City of Albia had an official policy concerning the use of non-deadly weapons. It provided simply that police officers were not permitted to use a non-deadly weapon unless they had been adequately trained and qualified, and pepper spray was an authorized non-deadly weapon. There appears to be no question that Hutchinson was properly trained and qual-

ified in the use of pepper spray, in fact at the time he had just been recertified as a chemical munitions instructor after completing a course provided by the Iowa Law Enforcement Academy. (Def. Supp.App. at 18). Davis does not explain how the alleged excessive force by Hutchinson implemented or executed a deliberate policy choice made by the City. *See Monell,* 436 U.S. at 690, 98 S.Ct. 2018; *Kuha,* 365 F.3d at 604–05 (indicating municipal liability for unconstitutional official policy may result where it is shown municipal employee's compliance with a policy caused the deprivation of constitutional rights). Moreover, the City's apparent reliance on appropriate training of its police officers does not, in the Court's judgment, amount to an unconstitutional policy.

■■■ The only evidence of a relevant municipal custom is that about two years before the incident with Davis Hutchinson had used pepper spray on another person stopped for a traffic offense. The circumstances of the prior incident are not shown in the record, but a single prior instance of unconstitutional misconduct would not be sufficient to demonstrate a "continuing, widespread, persistent pattern" of such conduct by municipal employees, much less deliberate indifference on the part of City policymakers. *See Mettler,* 165 F.3d at 1204.

In the absence of any evidence tending to show that the alleged excessive force was the product of a unconstitutional municipal policy or custom the defendant City is entitled to summary judgment.[12]

---

**12.** While conceding that the City does not have § 1983 liability under A theory of *respondeat superior,* Davis argues the state court petition removed to this Court would not preclude the use of *respondeat superior* as a theory of liability against the City under the Iowa Tort Claims Act or Iowa law. The petition,

however, has never been amended to incorporate these claims. While the petition contains a general reference to negligence, the only deprivation alleged to have caused injuries and damage to Mr. Davis is the alleged violation of his federal constitutional rights.

## IV.

## CONCLUSIONS AND ORDER

Plaintiff Davis' Fourth Amendment federal constitutional right not to be subjected to a warrantless arrest without probable cause was not violated by defendants. Davis has presented evidence which, viewed favorably to him, would support a finding that his Fourth Amendment right not to be subjected to excessive force in connection with his arrest was violated by defendant Hutchinson, however, that right was not clearly established in the specific context of this case with the result Hutchinson has qualified immunity from suit. Any excessive force violation was not the product of a municipal policy or custom. Accordingly, defendants' motion for summary judgment is **granted** as to both defendants. The Clerk of Court shall enter judgment dismissing the complaint.

IT IS SO ORDERED.